UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 6:19-CR-028-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| JOSHUA GREGORY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Joshua Gregory's Motion to Reconsider,

Amend and Vacate Order Adopting Magistrate's Recommended Disposition ("Motion to

Reconsider") [R. 61]. That Order [R. 60] addressed Defendant's Motion to Suppress [R. 31] in

which he sought to exclude evidence obtained during a "trash pull" at his property and from the

subsequent search of his home, conducted pursuant to a search warrant supported in part by the

trash pull evidence. Magistrate Judge Edward Atkins held an evidentiary hearing on Gregory's

suppression motion on October 7, 2019. [R.48] Afterwards, Magistrate Judge Atkins issued his

Recommended Disposition denying the Motion to Suppress, [R. 55], and this Court adopted the

Recommended Disposition [R. 60]. Gregory then filed this Motion to Reconsider, and the United

States responded in opposition [R. 62]. The Court held a second evidentiary hearing on June 19,

2020. [R. 76] The parties filed post-hearing briefs [R. 83; 84]. For the reasons stated herein,

Defendant's Motion to Reconsider is granted, and the evidence is ordered suppressed.

I.      **Background**

Deputy Cody Neal with the Wayne County Sheriff's Department approached Danny

Flynn, the owner of Cardinal Sanitation, about conducting a trash pull at Defendant Joshua

Gregory's residence on November 28, 2018. [R. 81, p. 11–12] Cardinal Sanitation had been collecting the trash at Gregory's residence for at least twelve years, every Wednesday typically between 10:00 a.m. and 11:00 a.m. *Id.* at 8–9, 12. Officer Neal directed Flynn to drive an empty garbage truck to Gregory's house around 8:28 that morning, passing up all other stops along the rural route, to collect the trash. *Id.* at 13–14, 69. Officer Neal also directed that he would accompany Flynn in the garbage truck during the trash pickup, and Flynn agreed. *Id.* at 11–13.

So at approximately 8:30 that morning, Flynn and Officer Neal drove an empty garbage collection truck to Gregory's residence and backed up the driveway approximately 100 feet, stopping within fifteen feet of Gregory's house. *Id.* at 14–15, 64; Pl.'s Ex. 1 (Stipulation), June 19, 2020. Flynn exited the truck and picked up six or seven bags of trash from the trash cans located by a light pole near the top of Gregory's gravel driveway, placing them in the empty truck. [R. 81, p. 15–16, 66] The light pole was located to the right of Gregory's house (looking up from the road), just a few feet to the right of his driveway and about twenty-seven feet from the house. *Id.* at 82, 89; Pl.'s Ex. 1 (Stipulation), June 19, 2020. The property had no fence or gate [R. 81, pp. 36, 44–45], but the undisputed testimony from the hearings demonstrated that Gregory's property was posted with several "No Trespassing," "Private Property," and "Beware of Dog" signs (referring to Gregory's vicious dog named "Baxter"). *Id.* at 22–23; *see also* R. 48 (first evidentiary hearing); Def.'s Ex. 4 (photograph), Oct. 7, 2019.

Flynn explained that most customers place their garbage beside the road where his company collects it. However, they will enter a customer's property to collect trash if the customer specifically requests it. [R. 81, pp. 10–11] While he had no record of Gregory (or his grandmother, Jo Carol Koger, the actual property owner) making such a request for Gregory's residence, his company would not enter Gregory's property absent a request. *Id.* Further, he had

never received any complaint about entering Gregory's property and picking up the garbage from its location up the driveway beside the light pole. *Id.* at 11.

As Flynn drove the garbage truck to Gregory's residence, Officer Neal activated his cell phone video recorder. *Id.* at 22; Pl.'s Ex. 2 (Video), June 19, 2020. While Flynn collected Gregory's trash, Officer Neal recorded areas on the front and side of Gregory's residence, within several feet of Gregory's house. [R. 81, p. 22] Officer Neal testified that he believed it was imperative for him to record the activities to document that he did not exit the vehicle and to preserve the "chain of custody" for the trash bags. *Id.* at 40–42. He further testified that he did not believe the trash pull could be accomplished without taking an empty truck with no other garbage to avoid contamination. *Id.* at 40–41, 46–47, 62–63. Officer Neal acknowledged that his sole purpose in entering Gregory's property was to further his criminal investigation of Gregory, who he suspected was a drug dealer, and at no time did he emerge from the trash truck to walk to the front door for a "knock and talk." *Id.* at 50, 64.

After collecting the garbage that morning, Officer Neal instructed Flynn to drive to a nearby church and hand the trash over to law enforcement. *Id.* at 67–68. Officer Neal removed the trash from the trash truck. *Id.* at 24. The trash contained some tin cans with drug residue on them and other items associated with drug use. [R. 31-2] This evidence was used to secure a search warrant later that day for Gregory's residence, *id.*, where additional evidence of drug trafficking was found.

Flynn's testimony at the two hearings revealed some significant differences in the way Gregory's trash was collected on November 28, 2018 from its usual, routine collection.[1] First, the garbage was collected around 8:30 that morning, around one-and-a-half to two-and-a-half

---

[1] The Court finds Flynn's testimony concerning when and how the trash was collected (and at whose direction) to be highly credible.

hours earlier than the customary 10:00 a.m. to 11:00 a.m. pickup time. [R. 81, pp. 27, 30]  Flynn

testified that he only drove a trash truck or helped with collection when one of his employees

missed work, but no employees had missed work that day. *Id.* at 19. Rather, he drove a separate

garbage truck at the request of Officer Neal. *Id.* at 18–19. He also testified that the empty truck

was a spare; the regular truck that collected trash from Gregory's residence had already left that

morning to collect garbage along the route that included Gregory's home. *Id.* According to

Flynn, those collection trucks typically carry three crew members: one driver and two

passengers. In the spare truck used to pick up Gregory's trash that morning, Flynn drove and

Officer Neal was the only passenger. *Id.* at 19–20. Furthermore, Flynn testified that no business

purpose was served by assisting Officer Neal:

| | | |
|---|---|---|
| Question: | What business purpose did [the trash pickup and delivery to law enforcement] serve? | |
| Flynn: | It didn't serve any. | |
| Question: | What business purpose had you accomplished for Cardinal Sanitation at that point [after picking up Gregory's trash and delivering it to law enforcement]? | |
| Flynn: | Absolutely none. | |

*Id.* at 25.

Gregory testified at the first evidentiary hearing. He claimed that the trash was sitting on

a metal bench on the back patio of the house on the morning of the trash pull, outside an exterior

doorway. He explained that in past years he had placed his garbage in cans by the light pole for

collection, but by November 2018, his practice was to place his garbage cans by the side of the

road about 120 feet from his house, near the entrance to his driveway. Before taking the trash to

the road, it was his habit to screen his trash for mail with personal information that thieves might

steal and needles (as he admitted to being an intravenous drug user at the time and says he

wanted to hide this fact).  Gregory testified that, on the day of the trash pull, he had not yet

screened the trash, so he had not moved it to its normal pickup location by the side of the road. This testimony conflicted with Flynn's testimony that the trash was always placed by the light pole. The Court credits the testimony of Flynn over that of Gregory on this issue.

Gregory, his grandmother, Jo Carol Koger, and Flynn described the landscape surrounding the home. The mobile home was placed on part of a larger 600-acre tract of land Koger owns that she described as slanted and rolling, and it was down a rural road, Kelley Lane Road, with no shoulder. *Id.* at 73–75. Flynn testified likewise that Kelley Lane Road was a narrow road with barely enough room for two cars to pass. *Id.* at 33–35, 75. To place Gregory's mobile home there, the family cleared approximately one acre of the land and cut an "L" shape into the hillside. *Id.* at 74–76. To reach the home from the road, you must travel up a steep driveway, approximately 120 feet long. Trees surround the residence on three sides. *Id.* at 36. There is no back yard, but there is a small back patio area, not visible from the roadway. Gregory testified that he would sometimes sit out in the patio area and occasionally grill out there. A boat was stored on the land directly in front of the home. *Id.* at 90. The area to the right of the home past the light pole (but even closer to the road) held a swing set and a storage building. *Id.* at 82–84. At one point the area also had a garden and a rabbit cage. Koger testified that all of the outdoor activities happened in this area (to the right of the house, driveway, and light pole) and on the small back patio because there was no other flat place on the property suitable for such items and outdoor activities.[2] *Id.* at 83–84. Based on the photos, the rear of the parked trash truck and the light pole were located behind the front perimeter of Gregory's front porch and behind the front perimeter of the swing set and storage building. *See* Def.'s Ex. 1–6 (Drawings and Photographs), June 19, 2020.

---

[2] The Court finds the testimony of Koger and Flynn concerning the landscape surrounding Gregory's home, and its uses, to be credible and corroborated by the photographic exhibits.

After the first evidentiary hearing, Magistrate Judge Atkins issued his Recommended Disposition, finding that the trash pull was not government action and therefore not subject to Fourth Amendment protection. He also found that the search warrant issued after the trash pull was not supported by probable cause, but that the good faith exception applied to prevent suppression of the evidence. Gregory made a series of objections to the Recommended Disposition, and the Court ultimately adopted the Recommended Disposition, denying Gregory's Motion to Suppress.

In his Motion to Reconsider, Gregory argues that the Court made a substantive mistake of fact by finding that Officer Neal "passively sat in the truck," [R. 60, p. 5], when in fact, he directed Flynn's activities and recorded the scene on his cell phone. Gregory also argues that the Court made an error of law by failing to find that the government actors entered the curtilage of the home without a warrant, thereby resulting in an illegal search. Lastly, Gregory argues that the Court misapplied the holding in *United States v. Bruce*, 396 F.3d 697 (6th Cir. 2005), *vacated in part on other grounds on reh'g*, 405 F.3d 1034 (6th Cir. 2005) and, as a result, it incorrectly held that Flynn was acting as a private party when removing the trash from Gregory's home.

For the most part, upon reconsideration, the Court agrees with defense counsel's recitation of errors in the Court's prior Order [R. 60], and here is why. The Court found that Flynn was not acting as a state actor because he did not do anything different on the morning of the trash pull "from the typical way his company had collected the trash for at least 12 years prior, apart from driving an empty truck directly to Defendant's residence with Officer Neal as a passenger." *Id.* at 3. The Court further found that Flynn did not have the intent of assisting law enforcement because he was "carrying out the normally scheduled collection" of Defendant's garbage. *Id.* at 10. But the facts developed, especially those at the second evidentiary hearing,

revealed significant differences between the routine collection of Gregory's trash and how it was collected on November 28, 2018—differences attributable to Officer Neal's instructions. These additional facts further revealed Flynn's only purpose in collecting the trash in this manner was to assist law enforcement.

Further, the Court initially found no error by Magistrate Judge Atkins in failing to make factual findings that Officer Neal entered the curtilage of Gregory's home because Officer Neal did not perform the trash pull but rather "passively sat in the truck while the garbage truck driver . . . took the trash." *Id.* at 5. The Court reasoned that there was no "search" for Fourth Amendment purposes by Officer Neal (since Flynn was the one to pick up the trash), and therefore Officer Neal's alleged entry into the curtilage was "irrelevant." *Id*. However, as later-developed facts made clear, Officer Neal did not "passively" sit in the truck. He orchestrated and directed Flynn's actions on the morning of the trash pull, and what is more, he video-taped it. His entry onto the curtilage of Gregory's property is not "irrelevant" as a legal matter because the facts demonstrate he entered the curtilage with the intent of performing a search (of the trash and with the video). This is, in and of itself, an unlawful search under the Fourth Amendment, making the Court's prior finding that "it makes no difference to the outcome whether Officer Neal entered the curtilage as he sat in the front seat of the truck" simply incorrect. *Id.* at 5.

For these reasons, explained in more detail below, the Court will vacate its prior order, [R. 60], and grant Gregory's Motion to Suppress, [R. 31].

## II.    **Legal Standard**

Gregory moves the Court to alter, amend, and vacate its order pursuant to Fed. R. Civ. P. 59(e). Under that rule, "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." The United States argues that this rule is an improper

vehicle by which to seek reconsideration of an interlocutory order denying a motion to suppress [R. 62]. The Court agrees but finds that it possesses the inherent authority to reconsider its February 6, 2020 Order.

The Sixth Circuit has distinguished the Court's power under Rule 59 to alter or amend final judgments from the Court's inherent authority to alter or amend interlocutory orders. *See, e.g.*, *Leelanau Wine Cellars, Ltd. V. Black & Red, Inc.*, 118 F. App'x 942, 946 (6th Cir. 2004). Notably, "[t]he Federal Rules of Civil Procedure do not explicitly address motions for reconsideration of interlocutory orders." *Rodriguez v. Tennessee Laborers Health & Welfare Fund*, 89 Fed. App'x 949, 959 (6th Cir. 2004). Rather, district courts have inherent authority under the common law to reconsider such orders. *Id.* (citing *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991)). "This authority allows district courts 'to afford such relief from [interlocutory orders] as justice requires.'" *Id.* (quoting *Citibank N.A. v. Fed. Deposit Ins. Corp.*, 857 F.Supp. 976, 981 (D.D.C.1994)). "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Id.* (citing *Reich v. Hall Holding Co.*, 990 F.Supp. 955, 965 (N.D. Ohio 1998)); *see also Louisville/Jefferson Cnty Metro Govt. v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009); *Guthrie v. Ball*, No. 1:11-cv-333, 2012 WL 4094526, at *1 (E.D. Tenn. 2012); *Thornton v. Western & Southern Financial Group Beneflex Plan*, No. 3:08-cv-648, 2011 WL 13209817 (W.D. Ky. 2011).

With this standard in mind, the Court views Gregory's Motion to Reconsider, Amend and Vacate [R. 61] as a motion for reconsideration based on the Court's inherent authority to alter or amend its own orders.

### III.     Burdens of Proof

Before considering the merits of Gregory's motion, the Court must address the applicable

burdens of proof in this case. Generally, the proponent of a motion to suppress "bears the burden

of establishing the challenged search violates his Fourth Amendment rights." *United States v.*

*Coleman*, 923 F.3d 450, 455 (6th Cir. 2019) (quoting *United States v. Witherspoon*, 467 F.

App'x 486, 490 (6th Cir. 2012)) (internal quotation marks omitted). To establish that a search

violates the Fourth Amendment, the search must fall within the scope of the Fourth Amendment,

meaning the search must be conducted by a state actor. *See United States v. Coleman*, 628 F.2d

961, 964–65 (6th Cir. 1980) (explaining that "the Fourth Amendment proscribes only

governmental action, and does not apply to a search or seizure, even an unreasonable one,

effected by a private individual not acting as an agent of the government or with the participation

or knowledge of any governmental official"). The area invaded by the state actor must also fall

within the scope of the Fourth Amendment's protections. *United States v. Dillard*, 438 F.3d 675,

682 (6th Cir. 2006) (explaining that "[t]he 'capacity to claim the protection of the Fourth

Amendment depends . . . upon whether the person who claims the protection of the Amendment

has a legitimate expectation of privacy in the invaded place'" (quoting *Rakas v. Illinois*, 439 U.S.

128, 143 (1978))).

Because the defendant bears the burden of demonstrating that the alleged search falls

within the scope of the Fourth Amendment, he necessarily bears the burden of proving that the

search was conducted by a state actor, thereby implicating the Fourth Amendment. *See United*

*States v. Freeland*, 562 F.2d 383, 385 (6th Cir. 1977) ("Where a motion to suppress evidence has

been made, the burden of establishing that the evidence was secured by an unlawful search is on

the moving party. It was thus incumbent upon Freeland to demonstrate that sufficient

governmental involvement existed to invoke the proscriptions of the Fourth Amendment.");
*Coleman*, 628 F.2d at 965 ("Where a motion to suppress evidence has been made, the burden of
establishing that the evidence was secured by an unlawful search is on the moving party. To
establish an unlawful search here, [the defendant] must demonstrate that the search was not a
private search even though [a private person] alone actively searched the truck."). The defendant
must also prove that the state actor searched a constitutionally protected area, or an area in which
the defendant had a reasonable expectation of privacy. *Dillard*, 438 F.3d at 682; *United States v.
James*, 534 F.3d 868, 872 (8th Cir. 2008) ("When moving to suppress evidence on the basis of
an alleged unreasonable search, the defendant 'has the burden of showing a legitimate
expectation of privacy in the area searched.'" (quoting *United States v. Pierson*, 219 F.3d 803,
806 (8th Cir. 2000))).

Accordingly, Gregory bears the initial burden of proving that the search was conducted
by state actors and that those state actors searched a constitutionally protected area—here, the
curtilage of his home or an area in which he held a reasonable expectation of privacy, as
discussed in more detail below.

If Gregory demonstrates that there has been a warrantless search—meaning a search of a
constitutionally protected area by a state actor, thereby implicating the Fourth Amendment—he
has made a prima facie showing of illegality. *See United States v. Jackson*, No. 1:14-cr-29, 2015
WL 4509452, at *8 (E.D. Tenn. July 24, 2015) (citing *United States v. Herndon*, 501 F.3d 683,
692 (6th Cir. 2007)). The burden then rests on the United States to prove the legality of that
search, or in other words, to demonstrate the applicability of an exception to the warrant
requirement. *See Herndon*, 501 F.3d at 692 ("The government has the burden of proving the
legality of a warrantless search." (citation omitted)); *United States v. Oliver*, 686 F.2d 356, 371

(6th Cir. 1982) ("The burden rests on the Government to establish that a warrantless search was conducted within the narrow confines of an established exception to the Fourth Amendment." (citations omitted)).

With these burdens of proof in mind, the Court now turns to the substance of Gregory's motion.

## IV.    Discussion

For the reasons articulated below, the Court will grant Gregory's Motion to Reconsider and will vacate its February 6, 2020 Order [R. 60].  In so doing, the Court finds that (1) Flynn was acting as a government agent when he participated in the trash pickup at Gregory's home on November 28, 2018; (2) the actions of Flynn and Officer Neal resulted in an illegal search and seizure because the two men entered the curtilage of Gregory's home without license to do so; (3) even if they did not enter the curtilage of the home, Gregory still held a reasonable expectation of privacy in that area and his trash cans; and (4) none of the exceptions argued by the United States saved the warrantless search of Gregory's trash or the subsequent search of his home, and the evidence must be suppressed.

### A.    State Action

The Fourth Amendment protects from unreasonable searches and seizures. However, it "proscribes only governmental action and does not apply to a search or seizure, even an unreasonable one, conducted by a private individual not acting as an agent of the government or with the participation or knowledge of any governmental official." *United States v. Lambert*, 771 F.2d 83, 89 (6th Cir. 1985) (citations omitted). In this Court's Order adopting the Recommended Disposition, the Court concluded that the private trash collector, Danny Flynn, was *not* acting as a government agent when he collected the trash bags from Gregory's property, relying on *United*

11

*States v. Bruce*. [R. 60] Gregory now asks the Court to reconsider that position, arguing that the present case is distinguishable from the facts and reasoning of *Bruce*. The Court agrees.

A private individual is not transformed into a government agent "merely because there was some antecedent contact between that person and the police." *Bruce*, 396 F.3d at 705 (quoting *Lambert*, 771 F.2d at 89) (internal quotation marks omitted). Furthermore, "a private party is not an agent of the government where 'the intent of the private party conducting the search is entirely independent of the government's intent to collect evidence for use in a criminal prosecution.'" *Id.* (quoting *United States v. Howard*, 752 F.2d 220, 227 (6th Cir. 1985), *vacated on other grounds*, 770 F.2d 57 (6th Cir. 1985)). Accordingly, "two elements must be shown in order to treat ostensibly private action as a state-sponsored search: (1) the police must have instigated, encouraged, or participated in the search; and (2) the private individual must have engaged in the search with the intent of assisting the police." *Id.* (citing *Lambert*, 771 F.2d at 89). "When these two prerequisites are not satisfied, evidence should be considered the fruits of a 'private search and, therefore, not within the purview of the Fourth Amendment.'" *United States v. Foley*, 23 F.3d 408, 1994 WL 144445, *2 (6th Cir. 1994) (quoting *Lambert*, 771 F.2d at 89).

In *United States v. Bruce*, a hotel manager contacted the local police department to report that a hotel employee had smelled burning marijuana coming from the defendant's hotel rooms. 396 F.3d at 702. The hotel manager—at the request of law enforcement "and in accordance with a hotel interdiction program operated in cooperation with the local police"—instructed his cleaning staff to "save, separately secure, and mark the trash bags obtained" from the hotel rooms. *Id.* The police then obtained a search warrant for the hotel rooms based in part on items found in the trash. *Id.* The defendant ultimately filed a motion to suppress the evidence from the rooms, which the trial court denied. The Sixth Circuit affirmed that decision after concluding that

12

neither of the two prongs of the state-action test had been satisfied. *Id.* at 706. As to the first element, the Sixth Circuit found that no search occurred; rather, the cleaning crew had merely preserved the trash that they collected during their "typical cleaning routine," and they had not otherwise deviated from that routine. *Id.* The Court also noted "that hotel employees had initiated contact with the police, and not vice versa." *Id.* The Court then explained that the second element had not been satisfied because the hotel employees "had the distinct and independent intent—and indeed, the obligation—to clean these rooms and empty their trash, just as they would do with any other room in the hotel." *Id.* For the reasons explained below, *Bruce* is distinguishable from the present case.

### 1.  Law Enforcement's Involvement in the Search

The first inquiry of the state-action test, as articulated in *Bruce*, is whether the police instigated, encouraged, or participated in the search. First, unlike the law enforcement officers in *Bruce*, Officer Neal actively sought out the assistance of a private individual, Danny Flynn, directing the collection of Gregory's trash under circumstances outside Cardinal Sanitation's "typical [trash collection] routine." *Id.* Officer Neal approached Flynn and told him the specific house where he wanted the trash collected. [R. 81, p. 20] Neal accompanied Flynn on the trash run, and virtually every action taken during the trash run was performed pursuant to the direction of Officer Neal.  For example, Officer Neal insisted that Flynn take an empty truck and drive directly to Gregory's residence, skipping the normal trash stops along the way. *Id.* at 20–21. This resulted in the trash being collected up to two-and-a-half hours earlier than normal. *Id.* at 27. According to Officer Neal, the *only way* they could conduct the trash pull was if he was in the trash truck, and the truck was empty—meaning this was a special trip. *Id.* at 62–63, 69. Officer Neal even checked the truck to ensure that it was empty. *Id.* at 40.  Immediately after leaving

Gregory's property, Officer Neal instructed Flynn to drive to a nearby church, where he and another deputy unloaded the trash. *Id.* at 13, 67–68. Flynn testified this was all outside the normal, customary trash pickup:

| | |
|---|---|
| Question: | So was it Cody Neal's desire to completely change the character of your trash collection, correct? |
| Flynn: | Correct. |

*Id.* at 23–24.  Flynn was asked whose idea it was to conduct the trash pull in this manner:

| | |
|---|---|
| Question: | Was any of this process your idea? |
| Flynn: | No. |
| Question: | Whose idea was it? |
| Flynn: | It was something the cops wanted done. |

*Id.* at 27; *see also Foley*, 1994 WL 144445, at *3 (finding it "clear" that the first prong was met when a woman, upon discovering that a suspicious package addressed to her son was being held at the post office, contacted the police and the police directed her to pick it up).

Moreover, unlike the law enforcement officers in *Bruce* (who never entered the hotel rooms), Officer Neal accompanied Flynn during the trash pull and in so doing, trespassed on to Gregory's property. The government claims that Officer Neal's presence in the truck does not change the analysis because he did not "direct, control or participate in the collection of the garbage; rather, he merely sat in the front passenger seat, holding a cell phone camera for the purpose of recording his *non-participation* in the collection of the garbage." [R. 84, p. 4 (emphasis added)] But the facts developed at the evidentiary hearing, as explained above, flatly demonstrate otherwise. Officer Neal sat in the passenger seat as Flynn drove the truck about 100 feet up Gregory's driveway and parked within fifteen feet of the residence—despite the fact that the property was posted with several "No Trespassing," "Private Property," and "Beware of Dog" signs. [R. 81, pp. 29, 64–65].  Rather than passively sitting in the cab, Officer Neal took a cell phone video during the trash pull, pointed toward Gregory's house (not the trash cans) and

14

areas he would not have been able to view from the road (or at least not with the same clarity). *Id.* at 65. When questioned during the evidentiary hearings, Officer Neal could not articulate *any* legal basis for being on Gregory's property, let alone a basis for videotaping Gregory's house within fifteen feet of the residence. *Id.* at 47–53, 64. And though he claimed that he had not participated in the trash pull, *id.* at 53, Officer Neal insisted that his presence at the trash pull (and his videotaping of the scene) was necessary to establish the chain of custody. *Id.* at 41. If the trash pull could not be conducted without Officer Neal and his cell phone camera, as he claimed, then Officer Neal necessarily participated in the search.

And a closer reading of *Bruce* reveals why it is inapposite.[3]  There, the officers' sole involvement in the trash collection was simply to ask the cleaning staff to "separately maintain and mark the trash bags" after they were "removed *during their routine cleaning of the rooms*"— nothing more. *Bruce*, 396 F.3d at 706 (emphasis added). While it is true, as the United States points out, that the hotel in *Bruce* participated in a drug interdiction program, that fact in no way affects the outcome of the present case because the police in *Bruce* had no involvement in the trash pull, and it was accomplished as part of the hotel's normal, routine collection protocol. As the Court in *Bruce* observed, "There [was] no evidence that the staff were asked . . . [to] deviate from their typical cleaning routine." *Id.* The Sixth Circuit also noted that "hotel employees initiated contact with the police, not vice versa." *Id.* But here, the collection of Gregory's trash was out of the ordinary in significant ways, all specifically at Officer Neal's request and

---

[3] First, *Bruce*'s state action holding appears to be dicta.  The Court stated "we *doubt* that either prong of the *Lambert* test has been satisfied." *Bruce*, 396 F.3d at 706 (emphasis added). The Court went on to hold that even had the cleaning staff been state actors, the defendant had no reasonable expectation of privacy in the trash placed in the hotel room where the officer credibly testified that he instructed the hotel management "that the cleaning staff should collect the trash . . . only during their *ordinary cleaning routine*," and where the evidence demonstrated that no "Do Not Disturb" sign was on the door. *Id.* at 708; *see also infra* Section IV(A) (discussing *Bruce*).

direction. These facts belie the government's claim that Flynn was simply "preserving" the potential evidence that he would have collected in any event.

The Court finds that Officer Neal instigated, encouraged, and participated in the search of Gregory's property, and the first prong of the state-action test is therefore satisfied. To the extent that the United States argues that this first prong is not satisfied because there was not a "search" to begin with, it puts the cart before the horse.  Prong one focuses on whether the police instigated, encouraged, and participated in the alleged search, not whether there *was* a search. The question of whether there was an improper search is answered by a different test (or rather, two tests), as explained in more detail below.

## 2.  Private Individual's Intent to Assist Law Enforcement

The second inquiry of the state-action test is whether the private party "engaged in the search with the intent of assisting the police." *Id.* at 705 (citing *Lambert*, 771 F.2d at 89). The *Bruce* Court reasoned that the hotel staff had a separate and independent intent to clean the rooms and empty the trash "just as they would do with any other room in the hotel." *Id.* The housekeeping staff were not "transformed into government agents merely because the police took an interest in the items they planned to remove from the room during their *normal cleaning activities*." *Id.* (emphasis added). The United States argues that Flynn likewise "was operating independent of the police's intent to conduct a criminal investigation." [R. 84, p. 3] Quoting from this Court's prior decision, [R. 60], and *Bruce*, the government argues Flynn "undoubtedly had the distinct and independent intent—and indeed the obligation—to [collect the] trash."  *Id.* at 11 (quoting *Bruce*, 396 F.3d at 706). Analogizing to the housekeeping staff in *Bruce*, the government argues that "Flynn would have still collected the Defendant's garbage absent any police involvement." *Id.* But Flynn flatly contradicted this argument, explaining that the truck

which normally picked up Gregory's trash had *already left* on its route for the day, [R. 81, p. 26], and to beat it there, Officer Neal instructed Flynn to make a special run with an empty spare truck. *Id.* at 18. As a result, they arrived at Gregory's residence roughly two hours earlier than his garbage was usually collected. *Id.* at 29–30. Tellingly, when asked what business purpose he had accomplished by making the trash run in this manner, Flynn testified, "**Absolutely none**." *Id.* at 25 (emphasis added).

Flynn testified he would never have collected Gregory's trash in this manner. When asked if he expected that his efforts were assisting the police, Flynn testified: "Yes. . . . Well, I knew that they was [sic] wanting something when they asked me and I done [sic] it because the cops asked me to do it." *Id.* at 30. Flynn's actions on November 28, 2018 were not "entirely independent of the government's intent to collect evidence for use in a criminal prosecution," *Bruce*, 396 F.3d at 706, but rather were undertaken for the *specific purpose* of assisting law enforcement. Given that Officer Neal instigated, encouraged, and participated in the trash pull, and Flynn's only intent was to aid the police, Flynn was acting as an agent of Officer Neal, making him a state actor.

### B.     Fourth Amendment Search

Having determined that Flynn was acting as a state actor when he aided Officer Neal in the trash pull at Gregory's residence, the Court must determine whether the actions of these state actors resulted in an unreasonable search or seizure under the Fourth Amendment.

The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. As the Supreme Court has explained, "The Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections:

17

When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Florida v. Jardines*, 569 U.S. 1, 5 (2013) (*quoting United States v. Jones*, 565 U.S. 400, 406 n.3 (2012)). Thus, pursuant to this "simple baseline" or trespassory test, the warrantless physical intrusion upon a constitutionally protected area constitutes an unreasonable search. *Id.* (citations omitted).

In *Katz v. United States*, 389 U.S. 347 (1967), the Supreme Court supplemented this baseline approach. *Id.* In that case, the Court found a Fourth Amendment violation where the government attached an eavesdropping device to a public telephone booth and recorded the defendant's phone conversations. In reaching this conclusion, the Court explained that the Fourth Amendment "protects people, not places," and it therefore "cannot turn upon the presence or absence of a physical intrusion." *Id.* at 351, 353. Rather, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* at 351 (internal citation omitted). Accordingly, "[o]ne who occupies [a telephone booth], shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world." *Id.* 352. Because the defendant in *Katz* held a reasonable expectation that his phone conversation would remain private, the government's interception of that private conversation constituted an unreasonable search.

In his concurrence to the *Katz* decision, Justice Harlan explained the Fourth Amendment question as follows:

> As the Court's opinion states, "the Fourth Amendment protects people, not places."
> The question, however, is what protection it affords to those people. Generally, as

18

here, the answer to that question requires reference to a "place."  My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable."

*Id.* at 361 (Harlan, J., concurring). The Supreme Court would go on to apply this two-part reasonable-expectation-of-privacy test in later cases. *See Jones*, 565 U.S. at 406 (citing *Bond v. United States*, 529 U.S. 334 (2000); *California v. Ciraolo*, 476 U.S. 207 (1986); *Smith v. Maryland*, 442 U.S. 735 (1979)).

In *Florida v. Jardines*, the Supreme Court clarified that, "though *Katz* may add to the baseline, it does not subtract anything from the Amendment's protections 'when the Government *does* engage in [a] physical intrusion of a constitutionally protected area.'" *Jardines*, 569 U.S. at 5 (quoting *United States v. Knotts*, 460 US. 276, 286 (1983) (Brennan, J., concurring in the judgment)); *see also Jones*, 565 U.S. at 409 ("[T]he *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test."). In that case, law enforcement officers conducted a warrantless dog-sniff of the defendant's front porch. 569 U.S. at 4. In considering whether this constituted a search, the Supreme Court acknowledged that "property rights 'are not the sole measure of Fourth Amendment violations.'" *Id.* at 5 (quoting *Soldal v. Cook County*, 506 U.S. 56, 64 (1992)). However, when a law enforcement officer gathers information "by physically entering and occupying the [curtilage of the house] to engage in conduct not explicitly or implicitly permitted by the homeowner," a search has occurred. *Id.* at 6. Reasoning that the Fourth Amendment's protections would be of little value if state agents could "stand in a home's porch or side garden and trawl for evidence with impunity," *id.*, the Court found that there was "no doubt that the officers entered [the curtilage]" because a front porch is "the classic exemplar" of curtilage. *Id.* at 7.

19

The Supreme Court reaffirmed its holding in *Jardines* in *Collins v. Virginia*, 138 S. Ct. 1663 (2018), analyzing whether the partially enclosed parking area at the top of the defendant's driveway was curtilage, like a front porch or the side garden referenced in *Jardines*. *Id.* at 1671. In determining the area *was* part of the home's curtilage, the Court did not undertake a *Katz* reasonable-expectation-of-privacy analysis, instead noting that "[w]hen a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred." *Id.* at 1670 (citing *Jardines*, 569 U.S. at 11).

Both *Jardines* and *Collins* make clear that an individual's Fourth Amendment rights "do not rise or fall with the *Katz* formulation." *Jones*, 565 U.S. at 406; *see also Morgan v. Fairfield Cty.*, 903 F.3d 553, 565 (6th Cir. 2018) ("*Jardines* and, more recently, *Collins* made clear that, outside of the same implied invitation extended to all guests, if the government wants to enter one's curtilage it needs to secure a warrant or to satisfy one of the exceptions to the warrant requirement." (citing *Jardines*, 569 U.S. at 7–8)). Rather, there are two approaches to determining whether a Fourth Amendment search has occurred. *Hicks v. Scott*, 958 F.3d 421, 431 (6th Cir. 2020) (citation omitted). Under the baseline property-rights approach, a Fourth Amendment search occurs when there is an unlicensed physical intrusion into a constitutionally protected area, such as one's home or the curtilage surrounding the home. *See, e.g.*, *Jardines*, 569 U.S. at 5. Under the reasonable-expectation-of-privacy test, as espoused in *Katz*, a Fourth Amendment search has occurred when the government violates an individual's reasonable expectation of privacy. *Jones*, 565 U.S. at 406 (citations omitted).

When the baseline property-rights test is satisfied—or in other words, when the government gains information by physically intruding upon a constitutionally protected area—it is unnecessary to consider whether that intrusion also violates a person's reasonable expectation

of privacy under *Katz*. *Hicks*, 958 F.3d at 431. Instead, "the physical intrusion itself is enough to establish that a search occurred." *Id.* (citations omitted). As the Supreme Court explained, "One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on [the defendant's] property to gather evidence is enough to establish that a search occurred." *Jardines*, 569 U.S. at 11. The Fourth Circuit applied these two separate tests in a post-*Jardines* trash pull case. *United States v. Jackson*, 728 F.3d 367 (4th Cir. 2013); *see also United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020) (applying same approach but declining to address the property-based analysis because the defendant failed to argue it), *petition for cert. filed*, (U.S. Sept. 16, 2020) (No. 20-5718); *United States v. Edwards*, No. 14-223-01, 2015 WL 3456651, *3 (E.D. Pa. May 29, 2015) (agreeing with Fourth Circuit's interpretation of *Jardines* as outlined in *Jackson*).

With these two tests in mind, the Court first considers whether Flynn and Deputy Neal physically intruded on a constitutionally protected area without a license to do so.

### 1. Physical Intrusion on a Constitutionally Protected Area

Under this baseline test, the Court asks two essential questions: First, were the government agents physically present in a constitutionally protected area? If so, was their presence in that constitutionally protected area the result of an unlicensed physical intrusion? *See, e.g.*, *Jardines*, 569 U.S. at 6–10.

### a. Constitutionally Protected Area

The Fourth Amendment specifies "with some precision" those places and things subject to its protection, namely, persons, houses, papers, and effects. *Id.* at 6 (quoting *Oliver v. United States*, 466 U.S. 170, 176 (1984)). It "does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to *Katz*) gather information in what [the

Supreme Court has] called 'open fields'—even if those fields are privately owned—because such fields are not enumerated in the Amendment's text." *Id.* (citing *Hester v. United States*, 265 U.S. 57 (1924)). However, "when it comes to the Fourth Amendment, the home is first among equals." *Id.* The protection afforded to the home extends to the area "immediately surrounding and associated with the home." *Id.* (quoting *Oliver*, 466 U.S. at 180) (internal quotation marks omitted). This area, often referred to as the curtilage, is regarded as "part of the home itself for Fourth Amendment purposes." *Id.* (quoting *Oliver*, 466 U.S. at 180) (internal quotation marks omitted). As the Supreme Court has explained, "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *Ciraolo*, 476 U.S. at 212–13. Accordingly, "[w]hen a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred." *Collins*, 138 S. Ct. at 1670 (citing *Jardines*, 569 U.S. at 11).

Whether an area has been searched "depends on the 'proper characterization' of [the area]," at least under the baseline property-rights approach. *Hicks*, 958 F.3d at 432 (quoting *United States v. Werra*, 638 F.3d 326, 331 (1st Cir. 2011)). However, defining the curtilage of a home is not always an easy task. *See Oliver v. United States*, 466 U.S.170, 182 n.12 (noting that courts may have "occasional difficulties" in determining whether an area is curtilage or an "open field" not subject to protection).  Generally speaking, the curtilage is the "area around the home [that] is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.'" *Jardines*, 569 U.S. at 7 (quoting *Ciraolo*, 476 U.S. at 213). In some cases, "the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life

extends—is a familiar one easily understood from our daily experience." *Oliver*, 466 U.S. at 182, n.12. The front porch, for example, "is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Jardines*, 569 U.S. at 7 (quoting *Oliver*, 466 U.S. at 182, n.12).

Whether other areas around the home also qualify as curtilage "is determined by factors that bear upon whether an individual may reasonably expect that the area in question should be treated as the home itself." *United States v. Dunn*, 480 U.S. 294, 300 (1987) (citation omitted). Central to this inquiry is a determination that the area in question hosts the "intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Id.* (quoting *Oliver*, 480 U.S. at 180) (internal quotation marks omitted). To address this question, the Supreme Court articulated four factors for courts to consider:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id.* at 301 (citations omitted). The Court explained, however, that these factors do not "produce[] a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." *Id.* Instead, these four factors "are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.*

With these factors in mind, the Court turns to addressing whether Flynn and Officer Neal entered the curtilage of Gregory's home. The Court finds two post-*Jardines* cases to be instructive: *United States v. Jackson*, 728 F.3d 367 (4th Cir. 2013) and *Commonwealth v. Ousley*, 393 S.W.3d 15 (Ky. 2013). In *Ousley*, the police conducted two warrantless trash pulls on the

defendant's property. To complete the trash pulls, the officers walked onto the property late at night and took the trash bags from outdoor trash cans located near the defendant's townhouse. *Id.* at 19. The trash cans were located on the far side of the defendant's one-car driveway, closest to the neighboring townhouse; however, they were only the width of the driveway away from the defendant's townhouse. *Id.* at 21. They were also even with the front of the home. *Id.* at 19. At the time of the trash pulls, the neighboring homes had placed their trash cans at the curb for pickup; however, the defendant's cans had not been taken to the curb and were located about twenty to twenty-five feet from the curb. *Id.* at 20.

The Supreme Court of Kentucky considered the four *Dunn* factors and ultimately determined that the cans were located within the curtilage of the home. More specifically, the court noted that (1) the area was *not* enclosed by a fence, but the home was in an urban area and the trash was only a few feet from the home (about the width of the driveway); (2) the trash was secured in a closed container, and although the trash cans were visible from the street, the contents were not (and the trash cans themselves were hidden if a car was parked in the driveway); (3) the defendant used the area for home storage, staging yard work, and parking his car, activities that were typically part of daily living; and (4) the trash cans were described as being a "very short distance" from the home and "pretty close" to the home. *Id.* at 27–28. The court highlighted the importance of this last factor, explaining that "[t]he closer one gets to the structure of the house, the more likely one is proceeding into the curtilage." *Id.* at 28. The court therefore concluded that the trash cans were within the curtilage of the home and were protected by the Fourth Amendment. *Id.* at 29.

In *Jackson*, the Fourth Circuit also applied the four *Dunn* factors but concluded that the trash can in that case was located outside the curtilage. 728 F.3d at 370–71. The defendant lived

24

with his girlfriend in a multi-unit apartment complex. *Id.* at 370. Behind each apartment unit was a concrete patio, followed by a two-to-three-foot grass strip, then a concrete sidewalk that ran the length of the building and led to a public street. *Id.* at 370. Beyond the sidewalk was a grass courtyard. *Id.* During a drug trafficking investigation, officers pulled two bags of trash from a trash can located behind the girlfriend's apartment. *Id.* The trash can was not located in its normal place on the apartment's back patio, nor had it been taken to the public street for pickup. *Id.* at 370–71. Rather, it was sitting partially on the strip of grass and partially on the concrete sidewalk. *Id.* at 371. The Court noted that (1) the trash can was at least twenty feet from the apartment's back door, which was a considerable distance in the context of a multi-unit apartment complex; (2) there was no enclosure surrounding the property; (3) the trash can was found in a common area used by all of the building's residents and guests; and (4) the defendant had not taken any steps to shield the area from the view of passersby. *Id.* at 374. The Court therefore affirmed the district court's conclusion that the trash was taken from an area outside the apartment's curtilage. *Id.*; *see also Edwards*, 2015 WL 3456651 at *3 (explaining that the driveway's close proximity to the home and the neighboring fences that demarcated the defendant's property indicated that some portion of the area was curtilage but the trash cans were placed beyond that area).

Applying the four *Dunn* factors to the present case, the Court concludes that Officer Neal and Flynn entered the curtilage of Gregory's home. The first factor—proximity to the home— weighs strongly in favor of this finding. Gregory's trash cans were approximately twenty-seven feet from his house, just a few feet to the right of the top of his gravel driveway. Pl.'s Ex. 1 (Stipulation), June 19, 2020. Though this is a slightly greater distance than the cans in *Ousley* (which were about the width of the driveway from his house) and *Jackson*, Gregory's home is

25

located in a rural area, on a one-acre lot, not an urban lot, as in *Ousley* and *Jackson*. *See Dunn*, 480 U.S. at 309 (finding that barn's location sixty yards from the home, a "substantial distance," did not support a finding that the barn was part of the home's curtilage). Further, the trash truck where Flynn and Deputy Neal were riding pulled within fifteen feet of Gregory's house—about the width of the driveway in *Ousley*.  The cans in *Ousley* were about twenty to twenty-five feet from the street, whereas Gregory's trash cans were ninety-eight feet eight inches from the road— that is, they were about four times closer to the house than the rural road. As in *Ousley*, the pictures and drawings admitted at the evidentiary hearing reflect that the rear of the trash truck and the light pole where the trash cans were located were flush even with the front porch, again reflecting the proximity to the home.  Def.'s Ex. 1–6 (Drawings and Photographs), June 19, 2020.  Unlike *Jackson*, neither the trash cans nor the trash truck were anyway near a common area or sidewalk.

The second factor asks whether the area was within an enclosure. As in *Ousley* and *Jackson*, the area at issue was not contained within a fence or other man-made enclosure. However, the unique rural landscape essentially provided a natural barrier for most of the property. As noted above, the one-acre lot was surrounded on three sides by dense woods and was part of a larger 600-acre tract of land owned by Gregory's grandmother. The pictures reflect Gregory had no close neighbors. Given this unique landscape, the absence of an enclosure "cannot deprive [Gregory] of having curtilage surrounding his home." *Ousley*, 393 S.W.3d at 27; *see also Morgan*, 903 F.3d at 561 (under a "commonsense approach [to the *Dunn* factors], the area five-to-seven feet from [the defendants' home] was within the home's curtilage" notwithstanding there was no fence or enclosure).

Under the third *Dunn* factor, the Court must consider how Gregory used the areas. Officer Neal testified that on the morning of the trash pull, a black truck and silver car were parked at the very top of the driveway, and a boat was parked directly in front of the house.  [R. 81, pp. 44–45] Gregory testified that he parked his cars at the top of the driveway, sometimes to obscure the view from passersby of female visitors who he occasionally directed to park on the rear patio to secret them from view. In addition to a small back patio behind the home, Gregory's grandmother testified that the only other areas flat enough for outdoor activities were those portions of the land to the right of the light pole (and closer to the road), containing a swing set (twenty-eight feet to the right of the light pole) and a storage building (sixty-two feet to the right of the light pole). *Id.* at 82–84, 92–93. The photographic exhibits admitted at the hearing confirmed these facts. *See* Def.'s Ex. 3–6 (Photographs), June 19, 2020. The storage building held various yard implements and lawn care supplies according to Koger. [R. 81, pp. 84–86] The same area had previously housed a vegetable garden and rabbit cages years earlier. *Id.* 84–88. These activities—parking your car, home and yard storage, gardening, and raising pets—are traditional activities of daily life that support a finding that the areas were within the curtilage. *See Collins*, 138 S. Ct. at 1671 (partially enclosed carport area where the officer searched "constitutes an area adjacent to the home and to which the activity of life extends, and so is properly considered curtilage"); *Ousley*, 393 S.W.3d at 28 (noting that home storage, staging yard work, and parking one's car are activities of daily living).

The fourth factor—the steps taken by Gregory to protect the area from the observation of passersby—also weighs in favor of a curtilage finding. As noted above, Gregory's property was surrounded by dense trees on three sides. The only straight view of the property is from the road that sits about 109 feet from the home at the bottom of a gravel driveway. From that view, one

can see the front of the property, along with the light pole and trash cans, from a distance. The narrow road in front of the property has no shoulder. It would therefore be difficult for a passerby to simply stop his vehicle and look up the driveway into the property. Flynn testified that someone driving by the residence at a normal rate of speed would only be able to get a passing glance up the driveway.  [R. 81, p. 37]

Further, the testimony was consistent that Gregory took steps to ward off visitors. He had at least two "Beware of Dog" signs in his yard, as well as four "Private Property" signs and two "No Trespassing" signs. Consistent with his other efforts to ward off visitors, Gregory had a vicious guard dog, Baxter, and surrounded his property with an underground fence. He ran the electric fence in such a way to allow minimal access (down by the road) to the postal carrier and water company employee. *Id.* at 77. While a passerby would not be able to view the underground fence, it indicates Gregory's efforts to restrict access to his property. Flynn and Officer Neal also testified that the trash cans by the light pole were visible from the road, but not the trash within the cans. Gregory placed his trash in opaque bags then placed them in trash cans, so that the contents were not visible to anyone, reflecting his efforts to keep the area and the contents of his trash private. *See Ousley*, 393 S.W.3d at 27 (noting that trash was in a closed container so it was impossible to tell if it contained trash without opening it).

Though not a trash pull case, *Collins v. Virginia* is helpful in analyzing the *Dunn* factors based on similar facts. There, the Supreme Court found a carport area adjacent to the house at the top of defendant's driveway was curtilage. Standing in the street where he parked, the police officer saw a motorcycle, covered by a tarp, sitting in the carport which was located slightly behind the front perimeter of the house. *Collins*, 138 S. Ct. at 1668.  The driveway ran along the side of the front yard, and the carport where the motorcycle was parked was partially enclosed on

28

two sides by a brick wall (about car height) and on the third side by the home. *Id.* at 1670. The officer walked up the driveway into the parking area, looked under the tarp, and ran the license plate and vehicle identification numbers of the motorcycle, which had been stolen. *Id.* at 1668. The Court held that "[j]ust like the front porch, side garden, or area outside the front window, the driveway enclosure . . . constitutes an area adjacent to the home and to which the activity of home life extends, and so is properly considered curtilage." *Id.* at 1671 (*quoting Jardines*, 569 U.S. at 6, 7) (internal quotation marks omitted).

In this case, Officer Neal rode in the trash truck up Gregory's driveway to an area immediately adjacent to the home and analogous to the carport in *Collins* or the "side garden" referenced in *Jardines*, 569 U.S. at 6. Based on the photos, the area where the trash truck parked and where the light pole was located were behind the boat parked immediately in front of the house and at least flush (and likely behind) the perimeter of the front porch of the house. These areas were also behind the front perimeter of the swing set and storage building. Though the top of the driveway was not enclosed on two sides by a low wall, as in *Collins*, the area was immediately adjacent to the house on its left side and the top of the driveway was bounded by a hill sloping upwards. To the right of the top of the driveway (and closer toward the road) were other "areas of daily living" like a swing set, storage building and the place where the "side garden" and pets had previously been located. Further, the light pole where the trash was located was not on the path to the front door.[4] Like the officer in *Collins* who, from the road, could see the covered motorcycle at the top of that defendant's driveway, Officer Neal (and his agent, Flynn) saw Gregory's trash cans at the top of his driveway, proceeded up this driveway, and, akin to peeking under the motorcycle's tarp to retrieve the license plate number, opened the trash

---

[4] The pictures reflect no sidewalk (or even path) directly leading to the front porch.

cans and took a peek. The lack of a low wall around this particular area cannot prevent Gregory from having curtilage, as this area is equivalent to the carport area in *Collins* and the "side garden" referenced by the Supreme Court in *Jardines*. *Jardines*, 569 U.S. at 6; *see also Morgan*, 903 F.3d at 561.

The United States notes that "[c]ourts have repeatedly held that unenclosed driveways were not curtilage," and urges this Court to reach the same conclusion. [R. 84, p. 12] For instance, the government cites *United States v. Stitt*, 637 F. App'x 927, 930 (6th Cir. 2016) and argues that a driveway cannot be curtilage. There the Sixth Circuit held that the end of the driveway was not curtilage, where "[t]estimony established that *visitors* parked cars in the turnaround [at the end of the driveway]—decidedly not an activity associated with the privacies of life." *Id.* (emphasis added) (citations omitted). Here, Gregory testified that he occasionally directed female visitors to park on the back patio. Because visitors parked cars there, the United States argues that the area was "decidedly not an activity associated with the privacies of life," *id.*, and was therefore not curtilage. However, the testimony indicates these were isolated incidents, where Gregory occasionally asked his female visitors to park there to obscure their vehicles from the view of any passersby. In other words, this area provided a certain level of privacy, demonstrating that the top and rear of the driveway, and the back patio area, *were* areas "associated with the privacies of life." *Id.*

Furthermore, despite the United States' arguments, none of the cases cited by the United States announced a bright line rule that unenclosed driveways can never qualify as curtilage; rather, those courts applied the four *Dunn* factors to the unique facts of each case. Most of the cases cited by the government involve urban areas with short (often shared) driveways readily accessible to the public, or other factual distinctions. *See Coleman*, 923 F.3d at 456–57 (noting

the absence of a "no trespassing" sign, acknowledging the curtilage issue was "a close[]
question," and ultimately finding that the driveway was *not* within the curtilage of the home in
part because the driveway was "shared with other families and other condo residents frequently
walked past cars parked in front of condo units"); *United States v. Galavis*, 645 F.3d 347, 356
(6th Cir. 2011) (holding driveway was not within the protected curtilage where the driveway was
short, the area in question "abut[ed] the public sidewalk," defendant had taken no steps to protect
the area from public view, and it was used as a point of entry to the home); *United States v.
Estes*, 343 F. App'x 97, 101 (6th Cir. 2009) (noting the driveway was accessible from the
adjacent alley).

In two other cases cited by the United States, the courts emphasized the lack of "No
Trespassing" signs in finding the area in question was not curtilage. *See United States v. Brown*,
510 F.3d 57, 66 (1st Cir. 2007) (defendant also operated a motor repair business on the property
and the driveway was utilized by customers); *United States v. French*, 291 F.3d 945, 952 (7th
Cir. 2002) (there were "no gates, barriers, or 'no trespassing' signs" on the area in question). In a
case in which the defendant *did* utilize "No Trespassing" signs, the court found other factors
outweighed this fact. *United States v. Moffitt*, 233 F. App'x 409, 411–12 (5th Cir. 2007) (noting
that the driveway and front yard were "access areas for visitors to enter and knock on the front
door" in an "urban neighborhood," and defendant left his front gate open); *see also United States
v. Hopper*, 58 F. App'x 619, 623 (6th Cir. 2003) (reasoning that even if the area was curtilage,
"law enforcement officials may encroach upon the curtilage of a home for the purpose of asking
questions of the occupants"). On this point, the Court finds *Stitt* to be instructive. In addressing
the defendant's argument that rural, low-income properties lack clear divisions between curtilage
and public areas, the Court in *Stitt* noted that such divisions could be accomplished in rural

settings by "a railroad tie, a large rock, *or a sign would have marked the [curtilage] and warned visitors not to proceed further*." 637 F. App'x at 930 (emphasis added). That is precisely what Gregory did on his rural property.

The cases cited by the United States do not convince the Court that the areas at issue in this case fall beyond the curtilage of Gregory's home. These cases simply demonstrate the principle espoused in *Dunn* that the four curtilage factors do not "produce[] a finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." *Dunn*, 480 U.S. at 301. The question of whether a particular area falls within the curtilage of a home must be answered on a case-by-case basis and no single factor is determinative. Under the facts of this case, and applying a commonsense approach with all *Dunn* factors considered, the area fifteen feet from Gregory's house, which can be characterized as the functional equivalent of a carport area, is within the curtilage of Gregory's home. *See Morgan*, 903 F.3d at 561 (under a "commonsense approach [to the *Dunn* factors], the area five-to-seven feet from [the defendants' home] was within the home's curtilage" notwithstanding that there was no fence or enclosure).

Furthermore, to the extent it is necessary to distinguish this case from the driveway cases cited by the United States, the Court notes that the areas in question on Gregory's property do not abut a public sidewalk or alley; the unique landscape of Gregory's property provided a visual barrier to passersby; the area where the trash truck parked and where the light pole was located were behind the front perimeter of the house, the boat parked in front of the house, the swing set, and the storage building; the driveway did not lead to the front door of the home; the area surrounding the light pole was certainly not a path of entry to the home; and Gregory took

32

significant steps to flag his curtilage and ward off visitors, including a multitude of "No Trespassing," "Private Property," and "Beware of Dog" signage, as noted above.

In sum, based on the unique facts of this case as developed at the evidentiary hearings, each of the four *Dunn* factors weighs in favor of finding that the area where the trash truck parked and the area surrounding the light pole were within the curtilage of Gregory's home. The Court finds that this area is "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301. Accordingly, Flynn and Officer Neal physically intruded upon the curtilage of Gregory's home, a constitutionally protected area.

### b. Unlicensed Physical Intrusion

Having determined that Officer Neal and Flynn entered the protected curtilage of Gregory's home, the Court must next consider whether they did so through an unlicensed physical intrusion. In other words, did Gregory give permission, even implicitly, to Flynn and Officer Neal to enter the curtilage of his home, remove his trash in this manner, and videotape his property? *Jardines*, 569 U.S. at 8.

A license need not be express; instead, it can be implied from the customs of the area. *Id.* (citation omitted). For example, a knocker on the front door of a home is typically treated as an implicit invitation for "solicitors, hawkers, and peddlers of all kinds" to knock and attempt entry. *Id.* (quoting *Breard v. Alexandria*, 341 U.S. 622, 626 (1951)). "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id*. The Supreme Court has noted that compliance with this "traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." *Id.*

33

Similarly, "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id.* (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)).

However, "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a *specific purpose*." *Id.* at 9 (emphasis added). The *Jardines* Court explained the types of purposes that would fall outside acceptable societal norms:

> But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*. . . . To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. *The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose*. Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

*Id.* (second emphasis added).

In the present case, Flynn testified that his employees would not have traveled onto the property unless expressly asked to do so, and his company had always picked up Gregory's garbage from the cans by the light pole. However, even assuming that Cardinal Sanitation had a license, express or implied, to enter the property and collect trash from cans located by the light pole, that license was limited in purpose. There was, at most, a license for Cardinal Sanitation, a private company, to enter the property for the limited purpose of picking up the trash as part of its *normal collection process*. *See United States v. Biondich*, 652 F.2d 743, 745 (8th Cir. 1981) (noting that "no unusual procedures were followed other than to keep Biondich's garbage separate and available for inspection"). In this instance, however, Flynn was acting as a government agent, with the intent of aiding the police. When he entered the property with Officer Neal, about two hours earlier than his usual trash collection time and under very different

circumstances, he was not acting as a Cardinal Sanitation employee, but as a state actor. Instead of entering the property to collect the trash as part of the normal collection routine, he and Officer Neal entered the property for the *purpose* of aiding in a warrantless police search and investigation. This was beyond the limited scope of Cardinal Sanitation's license to enter the property.

Furthermore, even if Flynn was acting within the scope of his license to enter the property and collect the trash, that license would not transfer to Officer Neal simply by virtue of his presence in the passenger seat. "There is no principle in Fourth Amendment jurisprudence to the effect that police are free to do what *some* individual has been authorized to do." *United States v. Certain Real Property Located at 987 Fisher Road, Grosse Pointe, Michigan*, 719 F. Supp. 1396, 1405 (E.D. Mich. 1989) (quoting LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 2.6(c), at 30 (1989 Supp.)). Officer Neal had no authority to enter the curtilage and conduct a search (or videotape those areas). "[P]olice have only limited authority to come onto the curtilage." *Id.* at 1405 (quoting LaFave, *supra*, § 2.6(c), at 30). As noted above, they may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 569 U.S. at 8. However, "they must conduct themselves as would an ordinary social visitor to the premises. This hardly includes rummaging through the garbage cans of one's host." *Certain Real Property*, 719 F.Supp. at 1405 (quoting LaFave, *supra*, § 2.6(c), at 30); *see also Jackson*, 728 F.3d at 373 (acknowledging that, if the officers trespassed into the curtilage to conduct the trash pull, "it would be fairly clear" that they violated the Fourth Amendment, "[f]or surely if bringing a drug-sniffing dog onto a home's front porch is beyond the scope of the implied license that invites a visitor to the front door, so too is rummaging through a trash can located within the home's curtilage").

35

Putting aside the "No Trespassing" signs and assuming Officer Neal had an implied license to enter Gregory's front porch or driveway for a "knock and talk," Officer Neal made clear at the hearing that was never his purpose on November 28, 2018:

> Question:     You weren't doing a knock-and-talk.  You didn't go up to the door and knock on it, did you?
> Officer Neal:  No.

[R. 81, p. 50]

> Question:     Is it correct that you didn't have any other purpose for being on Mr. Gregory's property except for this trash pull?
> Officer Neal;  Yes.

*Id.* at 64; *see also id.* at 47–52. Officer Neal never attempted to make contact with Gregory. Instead, he entered the curtilage of Gregory's home—coming within fifteen feet of the home—for the specific purpose of conducting a warrantless search and videotaping areas of Gregory's property that he would not have had access to but for his trespass. *Id.* at 65. His actions, and indeed his sworn testimony, "objectively reveal[] a purpose to conduct a search, which is not what anyone would think he had license to do." *Jardines*, 569 U.S. at 10.

The Sixth Circuit has held that similar activity exceeds the limited license a visitor holds to knock and seek entry. For example, in *Watson v. Pearson*, 928 F.3d 507, 512–13 (6th Cir. 2019), three law enforcement officers attempted to serve a civil levy on Watson at his last known address. *Id.* at 509. The officers knocked on the front door for approximately twenty minutes. *Id.* Watson finally emerged from the home, but stated that it was his girlfriend's home, he did not live there, and he did not have anything of value on his person that the officers could levy. *Id.* Watson left, at which point the officers continued to knock on the front door, even turning the doorknob (but the door was locked). *Id.* They then walked around the exterior of the house to look for items that could be levied. *Id.*  During this tour of the property, the officers smelled

marijuana and thereafter obtained a search warrant for the premises, which produced evidence indicating the sale and use of marijuana. *Id.* at 509–10. The trial court granted Watson's suppression motion in his criminal case, and he then brought a 42 U.S.C. § 1983 action against the officers who conducted the warrantless search. *Id.* at 510.

The Sixth Circuit ultimately held that the officers had violated Watson's Fourth Amendment rights. The Court acknowledged that an officer may enter the curtilage of a home without a warrant "and knock on the front door in an attempt to speak with the occupants or to ask for consent to search the premises." *Id.* at 512 (citing *Jardines*, 569 U.S. at 8; *United States v. Thomas*, 430 F.3d 274, 277 (6th Cir. 2005)). Under prior Sixth Circuit cases, officers could even walk to the back of a residence to communicate with residents. *Id.* However, "*Jardines* clearly rejected [that] kind of intrusion into the curtilage." *Id.* And even if *Jardines* did *not* prohibit an officer from walking around the house for the purpose of speaking to a resident, the *Watson* Court explained it certainly prohibited an officer from entering the curtilage "*with the intent of performing a search*." *Id.* (emphasis added); *see also Brennan v. Dawson*, 752 F. App'x 276, 282–83 (6th Cir. 2018) (holding that officer exceeded scope of implied license to knock on front door when he, among other things, walked around the house five to ten times and knocked and peered into windows).

The United States asks the Court to create a trash exception (under an "abandonment" theory) to the curtilage case law, arguing that "[w]hen garbage is set out in its customary location for collection, the individual has no reasonable expectation of privacy even if that location falls within the home's curtilage." [R. 84 at 15] They cite to *Bruce* (which is not a curtilage case) and *United States v. Thompson*, 881 F.3d 629, 632 (8th Cir. 2018). In *Thompson*, the Eighth Circuit applied the *Katz* reasonable-expectation-of-privacy test to the search of trash cans located in the

driveway of the defendant's residence, close to the entrance of his garage. *Id.*  The Eighth Circuit held that this was the correct test, even "assuming the trash was within the curtilage of [the defendant's] home," relying on *California v. Greenwood*, 486 U.S. 35 (1988).  *Thompson*, 881 F.3d at 632. The United States urges the Court to follow the same analysis. [R. 84, pp. 15–16]. However, *Thompson* was decided only months before the Supreme Court's decision in *Collins*. In *Collins*, the Court makes clear that a law enforcement officer's unlicensed physical intrusion into the curtilage of a home constitutes a presumptively unreasonable search under the Fourth Amendment. Neither *Jardines* nor *Collins* makes any exception for *garbage* located within the curtilage, and *Greenwood* did not address that issue, as discussed in more detail below. *See infra*, Section IV(B)(2). The Court therefore declines to follow *Thompson*.

In fact, nothing in the Supreme Court's curtilage case law supports such an exception, and the Court has declined to create similar exceptions to the property-rights test. For example, the Court's decision in *Collins* rejected the state's analogous request to "expand the scope of the automobile exception to permit police to invade any space outside an automobile even if the Fourth Amendment protects that space." *Collins*, 138 S. Ct. at 1671. Calling it an "easy case" the Supreme Court declined to create an exception to the trespassory test. *Id.* In outlining its reasoning, the Court posed the following analogy:

> Imagine a motorcycle parked inside the living room of a house, visible to a passerby on the street.  Imagine further that an officer has probable cause to believe that the motorcycle was involved in a traffic infraction.  Can the officer, acting without a warrant, enter the house to search the motorcycle and confirm whether it is the right one?  Surely not.

*Id.* The Court reasoned that "[n]othing in our case law . . . suggests that the automobile exception gives an officer the right to enter a house *or its curtilage* to access a vehicle without a warrant." *Id.* (emphasis added). Such an expansion would "undervalue the core Fourth Amendment

protection afforded to the home and its curtilage." *Id.* at 1671. The Court further reasoned that even if the officer had seen illegal drugs through the window of Collins's house, assuming no other warrant exception applied, "he could not have entered the house to seize them without first obtaining a warrant." *Id.* at 1672.[5] The automobile exception "does not justify an intrusion on a person's separate and substantial Fourth Amendment interest in his home and curtilage." *Id.*

In *Morgan*, the Sixth Circuit likewise declined to create an exception to the trespassory test where the state argued such an exception would make it safer for law enforcement conducting a "knock and talk" because officers could be posted around the perimeter of the house. *Morgan*, 903 F.3d at 562–63. The Sixth Circuit reasoned:

> Many (if not most) Fourth Amendment violations would benefit police in some way. . . . *But the Bill of Rights exists to protect people from the power of the government, not to aid the government.* Adopting [defendants'] position would turn that principle on its head.

*Id.* at 563 (emphasis added).  So too here. Nothing in the Supreme Court case law suggests that a special trash exception exists.

Whether it is trash, treasure, or the kitchen sink, law enforcement may not trespass onto the curtilage of a homeowner's property "with the intent of performing a search" and remove that item. *Collins*, 138 S. Ct. at 1671; *Watson*, 928 F.3d at 512. Simply put, neither Officer Neal nor his agent, Flynn, had a license, express or implied, to enter Gregory's curtilage for the purpose of collecting his trash (and videotaping his home) as part of a warrantless police investigation. The facts developed make clear this was *not* part of Cardinal Sanitation's "usual" trash collection. Much like a "visitor exploring the front path with a metal detector, or marching

---

[5] The "plain view" argument alluded to by the government, [R. 84 at 16], is irrelevant because that exception involves situations where law enforcement are *lawfully* on defendant's property. *See Morgan*, 903 F.3d at 563 (law enforcement "discovered the marijuana only after entering [defendants'] constitutionally protected curtilage.  The plain-view exception does not apply").

his bloodhound into the garden before saying hello and asking for permission," Flynn and

Officer Neal did not have a license to do *that*. *Jardines*, 569 U.S. at 9. The Court finds that

Officer Neal and Flynn physically intruded upon the curtilage of Gregory's home, a

constitutionally protected area, without license to do so. The result is the same as in *Jardines* and

*Collins*: a Fourth Amendment violation.

## 2.  Reasonable Expectation of Privacy

As noted above, the reasonable-expectation-of-privacy test from *Katz* "'has been *added*

*to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment,

and so is unnecessary to consider when the government gains evidence by physically intruding

on constitutionally protected areas." *Jardines*, 569 U.S. at 11 (quoting *Jones*, 565 U.S. at 409).

Because the Court concludes that there was an unconstitutional, unlicensed physical intrusion

into the curtilage of Gregory's home, it need not consider whether Gregory held a reasonable

expectation of privacy in that area. *See id.* However, it is worth noting that, even if this Court

agreed with the United States' characterization of the area in which the trash truck and trash bags

were located and determined that the area was *not* the curtilage of the home, Gregory still had a

reasonable expectation of privacy in that space under the unique facts of this case.

To determine if an individual possesses a reasonable expectation of privacy in a space,

the Court must consider the two-part test from *Katz*: "First, the person claiming Fourth

Amendment protection must have 'exhibited an actual (subjective) expectation of privacy' in the

targeted area. Second, even if the person demonstrates a subjective expectation of privacy, that

expectation must also be 'one that society is prepared to recognize as 'reasonable.'" *Hicks*, 958

F.3d at 431 (quoting *Katz*, 389 U.S. at 359).

In this case, Gregory lived on a heavily wooded lot and posted multiple "No Trespassing," "Private Property," and "Beware of Dogs" signs. He also had an aggressive dog and had taken steps to keep traditional visitors (like postal workers and employees from the water company) from traveling beyond the mailbox or water meter, which were located only a few feet from the road. He testified about the steps he took to screen his trash for identifying information and to remove items that might indicate his drug use.[6] Gregory placed his trash in opaque bags then placed them into trash cans (located about 100 feet from the road), concealing their contents. Based on these facts and others outlined herein, the Court finds that Gregory held a subjective expectation of privacy in his trash, the area where the trash truck parked (about fifteen feet from his home), and where the trash was placed by the light pole.

The Court also finds that this expectation of privacy is one that society would recognize as reasonable. Given the trash truck's and the trash cans' proximity to the house and distance from the road, and the additional steps taken to keep the public at a distance (e.g., the "No Trespassing" signs, the protective dog), a member of the public would not reasonably conclude that they could travel 100 feet up Gregory's driveway, park fifteen feet from his home, walk a few steps over to the light pole, and take a look at the contents of his trash. Had the cans been placed at the roadway, clearly deposited for pickup by a third party, a reasonable person traveling down the road might conclude that they could stop, open the lid, and take a peek. In that scenario, the curious traveler would not need to trespass 100 feet onto Gregory's property to look through Gregory's trash.

---

[6] The United States argues that Gregory "admitted he knew his trash was susceptible to . . . snoops once he set it out for collection," citing certain testimony from the first evidentiary hearing. [R. 84, p. 7] However, it is clear from a review of that hearing that Gregory acknowledged only that people could look through his trash once it was placed "in the designated area," which he defined as the area down by the road, *not* by the light pole.

In *California v. Greenwood*, the Supreme Court considered whether a trash pull involving garbage left at the curb constituted an unreasonable search and seizure. The Court ultimately held that the defendants did not have an objectively reasonable expectation of privacy in trash that they placed on the curb for pickup. 486 U.S. at 39–40. The Court noted that "[it] is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public." *Id.* at 40. Further, the defendants had placed the trash on the curb for the express purpose of conveying it to the trash collector, who could have sorted through it or permitted others to do so. *Id.* The Court concluded that the defendants, "having deposited their garbage 'in an area *particularly suited for public inspection* and, in a manner of speaking, public consumption, for the express purpose of having strangers take it,' [] could have had no reasonable expectation of privacy in the inculpatory items that they discarded." *Id.* at 40–41 (emphasis added) (internal citation omitted). The facts here are decidedly different than *Greenwood*, as the trash was not paced at the curb or "in an area particularly suited for public inspection." *Id.*; *see also Jackson*, 728 F.3d at 375 (no reasonable expectation of privacy where defendants left their trash "in a common area shared by other residents of the apartment complex and their guests").

Citing *Bruce* and *Greenwood*, the government argues that Gregory lacked a reasonable expectation of privacy in his trash because he *abandoned* it, having left it at the normal pickup place under the light pole where Cardinal Sanitation would retrieve it. [R. 84, pp. 6–9] First, *Bruce* is not helpful to the government in this regard. The Sixth Circuit held that, even assuming the cleaning staff were state actors, the defendant had no reasonable expectation of privacy in the trash placed in the hotel room where the officer credibly testified that he instructed the hotel management "that the cleaning staff should collect the trash . . . only during their "*ordinary*

*cleaning routine,"* and where the evidence demonstrated that no "Do Not Disturb" sign was on

the door. *Bruce*, 396 F.3d at 708 (emphasis added). Here, the trash was collected outside

Cardinal Sanitation's normal collection routine, and the undisputed evidence demonstrated that

Gregory posted several "Private Property" and "No Trespassing" signs.

*Greenwood* is also unhelpful. In *Greenwood* the government argued that the defendants'

trash, left for pickup at the curb, was "abandoned." 486 U.S. at 51 (Brennan, J., dissenting). The

majority ultimately found that the defendant lacked a reasonable expectation of privacy in the

garbage, but it did not rely on an abandonment theory. *Id.* at 40–43; *see also United States v.*

*Hedrick*, 922 F.2d 396, 398 (acknowledging that "the continued viability of an abandonment

approach is questionable" after *Greenwood* (citation omitted)); *Certain Real Property*, 719

F.Supp. at 1405 (discussing *Greenwood*). Rather, it held that the act of depositing the garbage at

the curb of a public street—where it was "readily accessible to animals, children, scavengers,

snoops, and other members of the public"—for the express purpose of having a third party (the

trash collector) pick up the trash, did not evidence a reasonable expectation of privacy.

*Greenwood*, 486 U.S. at 40–41. The Court therefore held that the defendants "could have no

reasonable expectation of privacy in the inculpatory items that they discarded." *Id.* at 41; *see also*

*Hedrick*, 922 F.2d at 395; *but see United States v. Redmon*, 138 F.3d 1109, 1119–20 (7th Cir.

1998) (Coffey, J., concurring) (opining that the abandonment theory "continues to thrive in our

Fourth Amendment 'garbage' jurisprudence"). In his dissent, Justice Brennan noted that "[t]he

Court properly rejects the State's attempt to distinguish trash searches from other searches on the

theory that trash is abandoned and therefore not entitled to an expectation of privacy." *Id.* at 51

(Brennan, J., dissenting) (citing *California v. Rooney*, 483 U.S. 307, 320 (1987) (Brennan, J.,

dissenting)).

As Justice Brennan indicated, this Court's Fourth Amendment analysis does not turn on whether Gregory "abandoned" his property interest in his trash; rather, the Court must consider whether he retained a reasonable expectation of privacy in that trash. The placement of the trash for pickup by the trash collector is only one factor that the Court considers. In addition, the Court must also consider the trash's *proximity to the home*, as explained by *United States v. Certain Real Property Located at 987 Fisher Road, Grosse Pointe, Michigan*.  There, the Court considered whether trash left within the curtilage enjoys Fourth Amendment protection. In that particular community, the homeowners' garbage was not taken to the curb for collection. Instead, the city's "valet garbage service" used several "scooters" to enter the curtilage of each home, pick up the trash, and transport it to a full-size garbage truck waiting at the end of the block. 719 F. Supp. at 1397. Accordingly, to conduct the trash pull at the defendant's residence, a police officer posed as a municipal worker and collected the trash from its usual location at the rear of defendant's home and according to the standard procedure. *Id.* To do so, the officer, dressed as a municipal worker, drove a scooter up the side driveway to the rear of the home, where a barbeque grill and several trash bags were sitting up against the back of the home, and collected the trash bags. *Id*. at 1397–98.

In analyzing the defendants' privacy interest, the court reasoned:

> On a continuum, nobody can retain a reasonable expectation of privacy in garbage that is at a garbage dump; in *Greenwood*, the Supreme Court held that any privacy expectation in garbage at a curbside is also not reasonable. Garbage bags close to home—in a garage waiting to be set out by the curbside, within the curtilage, or in a back porch—can engender privacy expectations. While the garbage bags remained within the curtilage, the claimants retained control over them and could have retrieved them or items contained in them. It is not unheard of for people to retrieve a newspaper or sales slip that had been mistakenly thrown away. A reasonable expectation of privacy in garbage would be at its greatest level when the garbage is still being accumulated in the home.

44

719 F.Supp. at 1404–05 (citations omitted). Though the trash in *Certain Real Property* remained within the curtilage, the court's reasoning applies with equal force in this case (even assuming Gregory's trash was outside the curtilage). Gregory's trash was not discarded at a dump, nor placed at the curb of a public street. Rather, the trash was placed in its usual place of pickup by the light pole, but that light pole was only about twenty-five feet from Gregory's home and nearly one hundred feet from the public roadway—decidedly not the "functional equivalent" of the curbside in *Greenwood*. *Certain Real Property*, 719 F.Supp. at 1405. Gregory's expectation of privacy in that trash was therefore greater than if it had been placed at the curb, and less than it would have been had the trash remained in the home. The trash was most certainly close enough to the home that Gregory could retain control over it and certainly could have retrieved an item from it prior to Cardinal Sanitation's normal pick up time a couple hours later.

The *Certain Real Property* Court also noted that, while not dispositive, "the fact that police trespassed to obtain the garbage is of some relevance. Rather than inadvertent, the trespass was intentional and with the express purpose of finding evidence of drug activity in the garbage." *Id.* at 1405 (citing LaFave, *supra*, § 2.6(c), at 30). Officer Neal's trespass, like the officer's trespass in *Certain Real Property*, while not dispositive with respect to non-curtilage, is "of some relevance." *Id.* Gregory's limited license for Cardinal Sanitation to retrieve his trash at the normal time and in the normal course, was not sufficient for Officer Neal to enter Gregory's property (especially in the face of his "No Trespassing" signs) and did not somehow expose the trash to the public.  Gregory testified about his privacy interest concerning his trash. The trash's close proximity to the home—as well as his visible efforts to flag his privacy intentions (e.g., vicious guard dog, "No Trespassing" signage, and the other facts discussed above)—clearly demonstrate that Gregory's subjective expectation of privacy in his trash was objectively

reasonable (i.e., one that society would recognize as reasonable), regardless of whether it was placed in its usual place of pickup. No reasonable person would believe that someone from the public could walk (or drive) up Gregory's 100-foot driveway and rummage through his trash cans located a couple of car lengths from his home. The Court holds that under the facts of this case, Gregory was entitled to Fourth Amendment protection until his trash was taken to the curb (or an area readily accessible to the public), or removed by the trash collector in the normal course of collection. This was an unreasonable search in violation of Gregory's Fourth Amendment rights.

### C.    The Exclusionary Rule

For the reasons stated above, the Court finds that Officer Neal and Flynn, both acting as state actors, conducted an unreasonable search of Gregory's property. As a result of that illegal conduct, Officer Neal secured video footage of Gregory's property, as well as certain items from the trash, which were then cited as support for a search warrant.  With that search warrant, law enforcement conducted a search of Gregory's home and obtained additional evidence, which Gregory moves this Court to suppress along with the trash pull evidence.

Under the "fruit of the poisonous tree" doctrine, "evidence unlawfully obtained, including all derivative evidence flowing from it, should be suppressed." *United States v. McClain*, 444 F.3d 556, 564 (6th Cir. 2005) (citation omitted). This doctrine would require the suppression of any evidence obtained as a consequence of the illegal trash pull, including the evidence from the trash cans and the evidence seized from Gregory's home as a result of the search warrant. However, an illegal search or seizure does not automatically require suppression. *United States v. Leon*, 468 U.S. 897, 906 (1984).  Suppression is not warranted if: "(1) the government learns of the evidence from an 'independent source'; (2) the connection with the

unlawful search becomes 'so attenuated as to dissipate the taint'; or (3) the evidence 'would inevitably have been discovered.'" *Id.* (internal citations omitted). The good faith exception, explained below, could also prevent the suppression of the fruit of an illegal search.

Importantly, the Court must consider whether it would be appropriate to exclude the evidence under the facts of this particular case. To do so, the Court must "weigh[] the costs and benefits of preventing the use in the prosecution's case in chief of inherently trustworthy tangible evidence." *Id.* at 907. When balancing the costs and benefits of the exclusionary rule, the Court is mindful of its purpose: to deter police misconduct. *Leon*, 468 U.S. at 916. Against this benefit of deterrence, the Court weighs the high costs of exclusion. For example, as a result of exclusion, guilty defendants may go free or receive significantly reduced sentences through favorable plea agreements. *Id.* at 907; *see also Hudson v. Michigan*, 547 U.S. 586, 595 (2006) (explaining that suppression of evidence may "amount[] in many cases to a get-out-of-jail-free card"). In some cases, the favorable outcome for defendants may "offend[] basic concepts of the criminal justice system," "[p]articularly when law enforcement officers have acted in objective good faith or their transgressions have been minor." *Leon*, 468 U.S. at 907–08 (citation omitted). Accordingly, the exclusionary rule should not be indiscriminately applied, as this "may well 'generat[e] disrespect for the law and administration of justice.'" *Id.* at 908 (quoting *Stone v. Powell*, 428 U.S. 465, 491 (1976)). Stated another way, exclusion is an appropriate remedy only when the deterrence benefits outweigh its high costs. *Davis v. United States*, 564 U.S. 229, 238 (2011) (citation omitted). This presents a "high obstacle" for those seeking application of the exclusionary rule. *Hudson*, 547 U.S. at 591 (quoting *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 364–65 (1998)).

### 1. The Good Faith Exception

As the above-cited cases make clear, "the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." *Id.* (quoting *Herring v. United States*, 555 U.S. 135, 143 (2009)).  For example, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (citing *Herring*, 555 U.S. at 144). However, when law enforcement officers "act with an objectively 'reasonable good-faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence," then the deterrence rationale behind the rule is weakened. *Id.* (internal citations omitted). Although the government's arguments are somewhat unclear, the United States relies primarily on this good faith exception to argue against suppression. [R. 84, pp. 18–20]

The Court finds that the circumstances of this case warrant exclusion of the evidence obtained from the trash pull. This is not a case in which the law enforcement officer acted with a reasonable good-faith belief. Rather, Officer Neal knowingly trespassed onto Gregory's private property, with absolutely no lawful justification. When pressed to explain the legality of his actions, he offered no valid explanation:

> Question:      Is it correct that you didn't have any other purpose for being on
>                Mr. Gregory's property except for this trash pull?
> Officer Neal:  Yes.

[R. 81, p. 64] He insisted that his presence at the trash pull was necessary to "maintain chain of custody or to say there was no contamination of the bags, the trash," *id.* at 41, and there was no other way to accomplish the trash pull:

> Question:      So you're saying without you being . . . in the cab of the truck,
>                there was no other way [to accomplish the trash pull]?
> Officer Neal:  Right.
> Question:      None whatsoever?
> Officer Neal:  I don't think so.  I mean, I would have to stay with the bags.

*Id.* at 63.

The Court finds, however, that this trained law enforcement officer did not reasonably believe, in good faith, that it was necessary that he trespass onto the private property of an individual in order to achieve these goals. Based on this Court's review of the trash pull case law, law enforcement accomplish lawful trash pulls routinely and without unlawfully trespassing onto private property. *See, e.g.*, *Jackson*, 728 F.3d at 372–75 (finding officers lawfully obtained evidence from trash pull where cans were not located in the curtilage but rather were located on a common area of the apartment complex); *Greenwood*, 486 U.S. at 37 (explaining that officer "asked the neighborhood's regular trash collector to pick up the plastic garbage bags that Greenwood left on the curb in front of his house and to turn the bags over to her without mixing their contents").[7]

Officer Neal also insisted his presence and the video were necessary "to show that [he] had *no involvement* in collecting the trash." [*Id.* at p. 48 (emphasis added)] The Court wonders how Officer Neal had "no involvement" in the trash collection, but yet his presence was *necessary* to establish the chain of custody and lack of involvement. He could not have reasonably believed, in good faith, both of these things at the same time.

More to the point concerning Officer Neal's good faith, despite Officer Neal's insistence of the video's evidentiary import to establish the chain of custody, the video surfaced only on the morning of the first suppression hearing, and only after defense counsel fortuitously subpoenaed Officer Neal along with any "body cam" video. [R. 82] This was several months after the government provided discovery to defense counsel (with no video included). Notably, the

---

[7] To be clear, the Court's ruling is limited to the facts of this case. Trash pulls can be lawfully accomplished, as evidenced by the large body of case law. But here, the trash pull was accomplished unlawfully.

original discovery production apparently included pictures of the trash pull evidence after its collection that were taken from the same sheriff's office-issued cell phone used to create the video. [R. 81, p. 58] Despite his insistence regarding the evidentiary importance of the video, Officer Neal notably failed to turn over the video to the defense (and apparently even to the government) until subpoenaed.[8] [R. 82] This omission raises concerns about the credibility of Officer Neal's testimony on this and other issues.[9]

The Court next turns to the evidence obtained by the search warrant of Gregory's house. The affidavit supporting that search warrant relied heavily on the now-suppressed evidence from the trash pull. First, the Court notes that Magistrate Judge Atkins found the affidavit in support of the search warrant lacked probable cause (even *with* the trash pull evidence), and the Court agrees. [R. 60] Judge Atkins upheld the search, however, under the good faith exception. On this tenuous reed the government asks the Court to heap another layer of "good faith" to save the search of Gregory's house. But here the good faith exception ultimately collapses under the additional weight of the botched trash pull.

---

[8] At the first evidentiary hearing, Officer Neal testified that he had produced the cell phone video during the state court proceedings and, "to [his] knowledge," had presented the video to DEA Agent Chris Lyon at an earlier date, "before this process started." At the second evidentiary hearing, Officer Neal testified that he would have turned over the video to the DEA agent and the U.S. Attorney's office at the same time he turned over the rest of his case file but had "no idea" when that was. [R. 81, pp. 54–55] After the second hearing, and in response to an Order from the Court directing the United States to trace the path of the tardy video [R. 76], the government advised that Officer Neal "inadvertently" failed to produce the video along with the rest of his case file, and instead provided it to the government for the first time the weekend prior to the first evidentiary hearing, which took place on a Monday, in response to defense counsel's subpoena. [R. 82] The United States explained that, on October 5, 2019, the Saturday before the hearing, Officer Neal discussed the subpoena with DEA Agent Chris Lyon and mentioned that he had recorded a video of the trash pull on his cell phone. *Id.* At that time, neither Agent Lyons nor the U.S. Attorney's office were aware of any such video. *Id.* The government then turned the video over to defense counsel on the morning of the first evidentiary hearing. *Id.* In other words, when Officer Neal testified at the first evidentiary hearing that he had already turned over the cell phone video to the government at an earlier date, he had actually produced the video *for the first time* less than forty-eight hours prior, in response to a subpoena. Clearly, having discussed this issue with Agent Lyons that Saturday, he was aware of this fact.

[9] The Court also notes that the video is focused almost entirely on the front and side of Gregory's house, not the trash.

The Sixth Circuit previously considered "whether the good faith exception to the exclusionary rule can apply in a situation in which the affidavit supporting the search warrant is tainted by evidence obtained in violation of the Fourth Amendment." *McClain*, 444 F.3d at 565. In *United States v. McClain*, two officers responded to a "suspicious incident" at a vacant home. Concerned that a burglary was taking place at the home, the officers conducted a warrantless search of the residence. They did not find any drugs or witness any illegal activity, but they did discover plant stimulators, grow lights, and other items that indicated a marijuana growing operation. Officers thereafter obtained a search warrant based on that evidence. The Sixth Circuit first held that the officers lacked sufficient probable cause to perform the initial warrantless search, and exigent circumstances did not exist to support the search. *Id.* at 561–64. The Court noted that the officers acted in good faith, and "[s]ometimes the line between good police work and a constitutional violation is fine indeed." *Id.* at 563. However, an "unparticularized hunch that a crime was being committed" inside the home was not enough to justify the warrantless search. *Id.* at 564.

The Court next considered whether the good faith exception should apply to the evidence seized as a result of the search warrant. The Court acknowledged a divide among the circuits on this issue, but ultimately concluded that "this is one of those *unique cases* in which the *Leon* good faith exception should apply despite an earlier Fourth Amendment violation." *Id.* at 565 (emphasis added). The Court noted that, under the good faith exception, evidence should not be "subject to the exclusionary rule if an objectively reasonable officer could have believed the seizure valid." *Id.* at 566 (quoting *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989)) (internal quotation marks omitted). In the *McClain* case, "the facts surrounding the initial Fourth Amendment violation were 'close enough to the line of validity to make the officer's belief in the

51

validity of the warrant objectively reasonable.'" *Id.* (quoting *White*, 890 F.2d at 1419). The Court explained that the officers were not objectively unreasonable in suspecting that a burglary was taking place in the defendant's home, nor was there any evidence that the officers knew their search of the home was illegal. *Id.* "More importantly, the officers who sought and executed the search warrants were not the same officers who performed the initial warrantless search, and [the] warrant affidavit fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial warrantless search." *Id.*

This case is distinguishable from *McClain*. As explained above, Officer Neal could not provide any plausible justification for his trespass onto Gregory's property, nor explain any legitimate basis for recording Gregory's property on his cell phone (and failing to turn it over until subpoenaed). Thus, unlike *McClain*, this case is not one in which the facts are "close enough to the line of validity" to save from exclusion the evidence obtained as a result of the search warrant. Furthermore, Officer Neal is the same officer who completed the affidavit that supported the search warrant (which omitted any reference to the video tape and claimed the trash evidence was obtained "during the routine collection of [Gregory's] trash."). [R. 31-2] This fact also distinguishes the case from *McClain*, where the officers who sought and executed the search warrant acted in good faith and were not the same officers who conducted the warrantless search.

One more point about Officer Neal's good faith. As mentioned, the good faith exception only protects conduct that is "objectively reasonable." *Leon*, 468 U.S. at 919. Generally, that standard is met "only when an (ultimately incorrect) legal authority approved of the officers' actions," such as a warrant later found invalid, or a statute or binding appellate precedent later overturned. *United States v. Lee*, 862 F. Supp. 2d 560, 568 (E.D. Ky. 2012). Officer Neal's

actions were not objectively reasonable because the Fourth Amendment's prohibition on law enforcement entering the curtilage of a person's home with the intent of performing a search was clear at the time of the trash pull. *See, e.g.*, *Jardines*, 569 U.S. at 10–11; *Morgan*, 903 F.3d at 565. Even so, Officer Neal gave no thought whatsoever to whether his warrantless entry onto Gregory's property included the curtilage. Another deterrence goal served by suppression is for Officer Neal (and others like him) to take heed of the Fourth Amendment's requirements.

### 2. Inevitable Discovery and Attenuation Exceptions

Finally, the Court will address the government's arguments for saving the evidence from the trash pull and residence search under other exceptions to the "fruit of the poisonous tree" doctrine. As noted above, under the "fruit of the poisonous tree" doctrine, "evidence unlawfully obtained, including all derivative evidence flowing from it, should be suppressed." *McClain*, 444 F.3d at 564 (citation omitted). The burden is on the government to show that suppression is inappropriate through one of the exceptions (i.e., independent source, attenuation, or inevitable discovery). *United States v. Leake*, 95 F.3d 409, 412 (6th Cir. 1996).

In its post-hearing brief, the government for the first time makes undeveloped arguments related to inevitable/"but for" discovery and attenuation: "Flynn's collection of the garbage would have occurred all the same even if Officer Neal had driven separately to the residence and observed Flynn's collection from the road."[10] [R. 84, p. 17] But this (late) argument ignores the clear facts of this case: Officer Neal did *not* simply watch from the street and Flynn did *not* collect the trash as part of Cardinal Sanitation's "normal [trash collection] activities." *Bruce*, 396 F.3d at 706. The facts developed demonstrate that Flynn and Officer Neal arrived at Gregory's house a couple hours earlier that the normal trash pick-up time. And Flynn testified that but for

---

[10] The government does not argue under the inevitable discovery exception.

Officer Neal's instructions concerning the trash pull on November 28, 2018, this is *not* how the trash would have been picked up that day (or any other day). Maybe Gregory's trash would have been picked up later that morning by the normal truck and crew. But maybe Gregory would have screened his trash in the interval to remove the evidence of his drug use ultimately seized. We simply do not know because Officer Neal jumped the gun. The government bears the burden of proving this exception, and their wholly undeveloped argument fails.

Likewise, the government's half-hearted attenuation argument ("Officer Neal's presence in the driveway is too attenuated to merit suppression of evidence found in the garbage Flynn collected," [R. 84 at 18]) fails for the same reasons as their inevitable discovery argument. Whether a piece of information is "so attenuated as to dissipate the taint" depends on three factors: temporal proximity of the new information to the taint, intervening circumstances, and the "purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975); *United States v. Mills*, 372 F. Supp. 3d 517, 537 (E.D. Mich. 2019). Not all three factors are equally weighted; rather, whether something is temporally proximate depends on whether there were intervening circumstances, and the presence or absence of misconduct is the most important factor. *United States v. Shaw*, 464 F.3d 615, 627–28, 630 (6th Cir. 2006).

There were no temporal gaps or intervening circumstances between Officer Neal's presence in the trash truck and its retrieval by Flynn, his agent. Indeed, the facts developed at the evidentiary hearing demonstrate that Officer Neal orchestrated and directed the entire trash pull, and insisted his presence was a necessary part of effectuating the warrantless search. Likewise, there were no gaps or intervening circumstances between the trash pull and the residential search. The warrant for Gregory's residence was obtained later the same day and relied on the trash pull evidence. Further, Officer Neal testified he conducted no additional

investigation after the trash pull and before obtaining the search warrant. [R. 48 (first evidentiary hearing)].

Finally, the "purpose and flagrancy" of Officer Neal's misconduct—the "most important" factor—weighs strongly against attenuation. *Shaw*, 464 F.3d at 630. The Sixth Circuit has explained that law enforcement officers act with an unlawful purpose when they undertake an "investigatory" search—that is, "when officers unlawfully seize a defendant 'in hope that something might turn up.'" *United States v. Williams*, 615 F.3d 657, 670 (6th Cir. 2020) (quoting *Brown v. Illinois*, 422 U.S. 590, 605 (1975)); *see also Shaw*, 464 F.3d at 631 (noting that "*Brown* made it clear that the requisite 'quality of purposefulness' can be demonstrated when the [misconduct], in design and execution, is investigatory in nature"). Here, we do not have to guess at the "quality of purposefulness" related to Officer Neal's conduct. He readily acknowledged his only reason for entering Gregory's private property was to further his drug investigation. The following exchange between defense counsel and Officer Neal highlights the flagrancy:

> Q. Well, you said that before you ever went to Mr. Gregory's residence that day, that you had received information from four different law enforcement agencies that Mr. Gregory was involved in illegal drug usage, correct?
> A. I wouldn't have been collecting the trash if I didn't think he was doing that.
> Q. And you wouldn't have been videotaping the process if it wasn't for use in a criminal investigation of Mr. Gregory, would you?
> A. I videoed to show that I had no involvement in collecting the trash.
> Q. Let me ask it this way. Let's just assume you weren't in Mr. Flynn's truck on that particular day. Instead, you just parked your police cruiser at the bottom of the driveway of Mr. Gregory's. Do you believe you would have been authorized to get out of your car at that point in time, whip out your cellphone camera, turn the video on, walk up the driveway, and start videotaping around Mr. Gregory's house, standing in the same location where you were seated in Mr. Flynn's truck?
> A. I don't know the answer to that question.
> Q. Well, you don't do that, do you?
> A. Not generally, no.

55

Q. Do you walk up to people's houses that you don't have a warrant to go on their property and you walk right up to their house and start videotaping with a camera for a criminal investigation? Do you believe you're authorized to do that?

A. Walk up the driveway? You're saying walk up the driveway or what?

. . . .

Q. If you can answer that yes or no. Do you believe you're legally authorized to walk up to a person's house like Mr. Gregory, all the way up the driveway to the point where you were sitting in Mr. Flynn's truck, that same point, stand there with your video camera and videotape around his house? Yes or no?

A. Yes. Under certain circumstances, yes.

Q. Which circumstance?

A. There's such thing called a knock-and-talk.

Q. Okay.

A. You can see everything in plain view. It's no different than wearing a body cam.

Q. Okay. That's what I want to ask. But you weren't doing a knock-and-talk, were you?

A. I was riding in the truck.

Q. You weren't doing a knock-and-talk. You didn't go up to the door and knock on it, did you?

A. No.

. . . .

Q. You don't walk up to people's houses and do that without a warrant, do you?

A. Under certain circumstances, yes.

Q. Such as? Other than the walk-and-talk, the knock-and-talk circumstance, what other circumstance authorizes you to do that?

A. Well, a stolen vehicle that I can verify from the road, a stolen vehicle. I mean, there's circumstances that it's possible that that could happen, yes.

Q. Did you have a stolen vehicle in this case?

A. I didn't see one.

Q. Tell me some exception that would authorize you to do that in this case.

A. I don't know.

Q. Tell me what about being in Mr. Flynn's pickup truck or garbage truck that day authorized you to go up to his house like that and videotape to further your criminal investigation.

. . . .

Q. You had no exception under a stolen vehicle case in this case to walk up, did you?

A. No.

Q. Are there any other special circumstances about this case that you believe would have authorized you to walk up on his private property to the point where you were in Mr. Flynn's truck and videotape around his residence?

A. No. I was a passenger in a truck.

[R. 81, pp. 47–52]

Officer Neal (and apparently other law enforcement officers) had Gregory in their sights for some time. When other lawful investigatory measures apparently did not pan out, Officer Neal trespassed onto Gregory's property, cell phone camera in tow, "in the hope that something might turn up." *Williams*, 615 F.3d at 670. Officer Neal could not articulate a single lawful purpose for his actions, and this Court finds none. Officer Neal's unlawful purpose weighs heavily in favor of suppression, like the other factors. The government's one-line attenuation argument fails.

In sum, Officer Neal—and Flynn, acting at Officer Neal's direction—trespassed onto Gregory's private property, video-taped it, and seized Gregory's trash outside Cardinal Sanitation's normal trash collection procedures as part of a warrantless search to further his criminal investigation.  Officer Neal could not articulate a single legal or "good faith" justification for these actions, and this Court finds none. Under these circumstances, the good faith exception and the other exceptions argued by the United States are inapplicable, and the benefits of exclusion—namely, to deter similar police misconduct in the future—outweigh the costs. The facts of this case therefore mandate suppression of the evidence obtained from the trash pull, including the items seized from the trash and the cell phone video,[11] and the evidence seized from Gregory's home as a result of the search warrant.

## V.      CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, **IT IS HEREBY ORDERED** as follows:

1.      Defendant's Motion to Reconsider, Amend, and Vacate [**R. 61**] is **GRANTED**.

2.      This Court's February 6, 2020 Order Adopting Magistrate Judge's Recommended

---

[11] The United States has repeatedly stated that it does not intend to use the cell phone video as evidence in this case.

57

Disposition [**R. 60**] is **VACATED**.

3.     Defendant's Motion to Suppress [**R. 31**] is **GRANTED**.

This the 28th day of October, 2020.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY